**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**IRTH SOLUTIONS, LLC,**

           **Plaintiff,**

    **v.**
                                          **Civil Action 2:16-cv-219**
                                            **Judge James L. Graham**
                                            **Magistrate Judge Jolson**

**WINDSTREAM COMMUNICATIONS**
**LLC,**

           **Defendant.**

## OPINION AND ORDER

This matter is before the Court regarding a discovery dispute. Defendant Windstream Communications, LLC ("Windstream") requests that this Court impose sanctions against Plaintiff irth Solutions, LLC ("irth") and compel it to return forty-three privileged documents that Defendant produced twice—the first time in January 2017 and the second time in March 2017. Although Defendant claims that its production of the documents on both occasions was inadvertent, Plaintiff disagrees and argues that Defendant's actions waived the privilege. For the reasons set forth below, this Court agrees that Defendant's conduct waived the privilege. Consequently, Defendant's request for sanctions and the return of the forty-three documents is **DENIED**.

### I. PROCEDURAL BACKGROUND

Plaintiff filed this lawsuit in state court on January 29, 2016, alleging breach of contract, balance due on an account, unjust enrichment, promissory estoppel, fraud, and violation of a license agreement. (Docs. 1, 1-1). Defendant removed the action to this Court on March 10, 2016, based upon its diversity jurisdiction. (*See* Doc. 1).

Shortly after removal, Defendant notified the Court of the instant discovery dispute. The Court ordered, and the parties filed, simultaneous letter briefs. (*See* Docs. 38, 45–46). Upon review of the briefs, the Court held a telephonic status conference during which it determined that a discovery hearing would be necessary to understand the fact-specific nature of the dispute. (Doc. 42). The Court held the hearing on April 18, 2017 (Doc. 47), and the parties subsequently filed post-hearing briefs. (Docs. 48, 49). Although this Court provided the parties an opportunity to resolve the case extrajudicially (Doc. 57), those efforts failed. Thus, the dispute is ripe for resolution.

## II. FACTUAL BACKGROUND

At the heart of this matter is the parties' agreement concerning the production of electronically stored information ("ESI") made during a July 15, 2016 telephone conference. (Doc. 45-1). An email memorializing that agreement provides, in relevant part:

> **Privilege Log**
> - A producing party will produce a log listing all documents responsive to the receiving party's discovery requests that are being withheld on the basis of attorney-client privilege, attorney work product, or other applicable protection.
>
> **Privilege Clawback**
> The parties agreed that a formal court order under Fed. R. Evid. 502(d) was not necessary based on the scale of the case, but that the parties would agree among themselves as follows:
> - If a producing party discovers that it has inadvertently produced a document that is privileged, the producing party will promptly notify the receiving party of the inadvertent production.
> - The receiving party will promptly destroy or return all copies of the inadvertently-produced document.
> - Inadvertent production of privileged documents does not operate as a waiver of that privilege.

(*Id.*, PAGEID #: 307). Neither party disputes the agreement's contents or validity.

Discovery proceeded, and Plaintiff served Defendant with requests for production of documents and requests for admission on October 31, 2016. (Doc. 47, PAGEID #: 359). Plaintiff contends that it agreed to a thirty-day extension of time for Defendant's response, making the production due December 31, 2016, but Defendant failed to meet that deadline. (*Id.*).

After waiting another ten days for the production, Plaintiff's counsel Patrick McCarthy sent an email to defense counsel Jacqueline Matthews concerning the production. (*Id.*). Ms. Matthews did not respond to Mr. McCarthy's letter. (*Id.*). Instead, she sent a partial production on January 27, 2017, twenty-seven days after Plaintiff alleges it was due. That production contained forty-three privileged documents. (*Id.*, PAGEID #: 359–360; *see also id.*, PAGEID #: 350). The Court examines that production and a second production of the same forty-three privileged documents in turn.

### A. First Production of Privileged Documents

Defendant's January 27, 2017 partial production consisted of 2200 pages of documents, 1400 of which were in a readable format. According to defense counsel Michael Montgomery's affidavit and defense counsel Breaden Douthett's testimony at the hearing, defense counsel reviewed the documents for privilege prior to the production. (Doc. 46, PAGEID #: 319; Doc. 47, PAGEID #: 350). Mr. Douthett described that privilege review for the Court:

> [T]here were two levels of review involved in this production. We received documents from the client, and we had a seventh-year and a second-year associate assigned to the review. The seventh-year associate is Ms. Matthews, who's here today. She'd conducted an initial review and pass of the documents and then sent them to Marissa Black, who is a second-year associate, with the instruction to conduct a privilege review. The review was done on summation, and it provided for coding for attorney/client privileged documents.
>
> At the time, Baker & Hostetler believed it knew the identity of all in-house attorneys who were involved in the dispute. Obviously, this was not the case. Ms. Black conducted a privilege review. I've spoken to her repeatedly about this, and she believes she performed the privilege review. When it was done, Ms.

> Matthews went through and checked the review, noted that documents had been identified privileged, and produced documents.

(Doc. 47, PAGEID #: 350). Despite the fact that Defendant failed to provide a privilege log at the time of production, Defendant claimed that it had withheld between five and ten documents for privilege. (*Id.*, PAGEID #: 351). The Court determined later that only four documents were withheld initially. (*See id.*, PAGEID #: 360). The Court reviewed these documents *in camera,* which total only five pages. (*See* Doc. 52). One of those pages includes non-privileged material withheld as "providing legal advice." (Doc. 46, PAGEID #: 343).

Ms. Matthews explained that she was in the process of preparing a privilege log on February 8, 2017, when she realized that Defendant had produced forty-three privileged documents to Plaintiff as part of the first production. (*Id.*, PAGEID #: 352–53). Ms. Matthews contacted Plaintiff's counsel the same day, requesting a clawback of those forty-three documents. (*Id.*, PAGEID #: 353, 361).

Plaintiff's counsel claims that by the time Ms. Matthews made the request—twelve days after the production—the 1400 readable pages already had been "thoroughly reviewed." (*Id.*, PAGEID #: 361). Further, Plaintiff's counsel was skeptical about the attempt to enforce the clawback agreement. Plaintiff's counsel Colin Beach explained in a February 9, 2017 letter:

> First and foremost, it is hard for us to comprehend your claim that the documents were inadvertently provided to us. Given the time it took you to produce the incomplete set of documents (3 months), we cannot understand how they were not thoroughly vetted for privilege, and that if a document was believed to be privileged, why it would have not been appropriately included on a privilege log. Further, from your conversation with Mr. McCarthy, it is our further belief that Windstream brought this matter to your attention which leads us to believe that this issue is an attorney-client disagreement and not an inadvertent production of documents by counsel. This conclusion is further bolstered by the complete lack of a privilege log being furnished with the discovery. Finally, it is unbelievable that a firm with Baker Hostetler's reputation would make such an inadvertent mistake.

(Doc. 45, PAGEID #: 309). Plaintiff's counsel thus refused to return or destroy the documents, (*id.*), but represent that once the dispute arose, they sequestered the documents and refrained from discussing them with their client. (Doc. 47, PAGEID: 362). Plaintiff's counsel also requested a privilege log identifying all documents Defendant claimed to be privileged. (*Id.*, PAGEID #: 309).

The following day, Ms. Matthews responded with a bates-label identification of the forty-three documents Defendant sought to clawback (Doc. 46, PAGEID #: 320–21, 332–33), and had a conversation with Plaintiff's counsel regarding the alleged inadvertent production and the forthcoming production of a privilege log. (Doc. 47, PAGEID #: 353, 363; *see also* Doc. 45-1, PAGEID #: 311). Nineteen days after their first production of privileged documents, defense counsel produced a privilege log on February 13, 2017, listing forty-seven total documents. (Doc. 46, PAGEID #: 321, 336–43). During the hearing, defense counsel explained that the documents listed as 1 through 43 are the privileged documents produced by mistake, and documents 44 through 47 are the ones withheld initially as privileged. (Doc. 47, PAGEID #: 354; *id.*, PAGEID #: 389). Documents 1 through 43 total 146 pages.

Upon this Court's request, defense counsel submitted the forty-three documents (146 pages) for *in camera* inspection prior to the hearing. A review of those documents revealed that fourteen of the forty-three, or more than 32%, contain the word "legal." Stated differently, almost 1/3 of the documents contained the word "legal." Of the documents containing the word "legal," ten contained the question "Michelle, any guidance from legal . . . ?"

The Court questioned Mr. Douthett at the hearing regarding a representative sample of those documents:

THE COURT: I have questions about specific documents that you're representing to this Court that were reviewed for privilege but not identified as such. The first one is Bates stamped "Windstream 00101."
Do you have a copy of the documents?

MS. MATTHEWS: Yes.

MR. DOUTHETT: Yes, Your Honor.

THE COURT: I'll give Ms. Matthews a moment to provide it to you.
At the very bottom of that page—Well, I should start with the question. I am assuming the in-house legal counsel whom you had not identified as being a lawyer is Michelle Simpson. Is that correct?

MR. DOUTHETT: Yes, Your Honor.

THE COURT: At the bottom of that page, there's a signature block for Ms. Simpson. It reads: "Counsel to Director of Government Contract Compliance."
So, is it your representation to this Court that this document was reviewed for privilege and not caught as privileged, even with that signature line?

MR. DOUTHETT: Yes, Your Honor.

(*Id.*, PAGEID #: 351–52). The signature block, appearing below, was present in two additional documents Defendant sought to clawback.

**Michelle Simpson**
**Counsel II and Director of Government Contract Compliance | Windstream**
4001 Rodney Parham Rd. | Mailstop: B1F3-53A | Little Rock, AR 72212-2442
michelle.simpson@windstream.com | o: 501.748.7727 | f: 501.748.5590

The documents in which the signature block appears are between one and two pages in length.

The Court continued questioning Mr. Douthett.

THE COURT: Okay. I'd like to move on to another document. It's Bates stamped "Windstream 00600."

MR. DOUTHETT: Yes, Your Honor.

THE COURT: Let's go to the top of this page. And it states in the first sentence -- I don't need to read the whole sentence, but it's in the first sentence, the second line: "See my notes to our Legal below." And you can see that this is a forwarded e-mail with a back-and-forth.

So, is it your representation that that document was reviewed for privilege and not identified as such?

MR. DOUTHETT: Yes, Your Honor.

THE COURT: And the final one, Bates number Windstream 00 -- I apologize -- 00753, and again just going to the top of this page, first sentence: "FYI Legal is in agreement that we notify irth." And then it continues.
And it's your representation to this Court that this was reviewed for privilege, two layers of review, and not identified as privileged?

MR. DOUTHETT: Yes, Your Honor.

(*Id.*, PAGEID #: 351–52).

## B. Second Production of the Same Privileged Documents

Six weeks later, even as this dispute ensued, Defendant once again produced the forty-three privileged documents to Plaintiff. The second production contained the same 2200 pages as the first production (but this time all readable), 146 of which were of the same privileged information Defendant had produced previously. Thus, in the midst of arguing to this Court that it should protect Defendant's attorney-client communications and award it fees and costs (*see* Doc. 46 at 5), defense counsel again produced the privileged documents.

Mr. Douthett provided the following explanation to the Court:

What happened with the second production is, the parties had agreed to provide text-searchable electronic productions in the course of this case. And the plaintiff complained to Ms. Matthews that our production was not text searchable even though the production that they sent us was not text searchable and we hired a vendor and converted the documents to text searchable ourselves. They demanded, within one business day, that we produce text-searchable documents or they would seek relief from the Court.

\*\*\*

And, Your Honor, obviously, this was -- we wanted to take care of this promptly. And Ms. Matthews went in. And this is an electronic folder on a share site within the firm. Ms. Matthews went in to the folder and removed the fully-withdrawn privileged documents and replaced the documents that had been redacted with redacted documents, forwarded the link to our litigation support staff, and told them that they needed to be converted to text-searchable format. Unfortunately, litigation support staff did not utilize that link. They went back to another folder,

which was the original production, converted those documents into a text-searchable format, and then replaced the folder that Ms. Matthews had identified as having the privileged documents removed and redacted. And, so, when she opened up the folder and sent it on, it was actually a different set of documents, which was the same set of documents that were originally produced. Now, admittedly, obviously, there were two productions here; but I think it's important to note that, even though there was a second production, this is not a production of anything new. These are the same documents that the plaintiff already had and refused—had refused to give back.

(*Id.*, PAGEID #: 356–58).

Again, the Court had questions:

THE COURT: How were these documents produced to plaintiff?

MR. DOUTHETT: By FTP transfer.

THE COURT: Okay. And your litigation support staff member is the one who sent them to plaintiff; is that correct?

MR. DOUTHETT: I'm not quite sure about the mechanics of how that works, Your Honor. If I could ask Ms. Matthews.

MS. MATTHEWS: No, Your Honor. The litigation support staff indicated to me that the documents were ready to go out, and I served the documents on plaintiff's counsel via FTP transfer.

THE COURT: Did you review the documents before you sent them to plaintiff's counsel?

MS. MATTHEWS: I did a spot check of them. I did not, unfortunately, observe that they contained the privileged documents from our initial production.

(*Id.*, PAGEID #: 358).

Upon review of the second production on March 28 or 29, 2017, Plaintiff's counsel again saw the forty-three privileged documents and sequestered them. (*See id.*, PAGEID #: 362, 369).

## III.  DISCUSSION

Naturally, the Court begins with a discussion of the attorney-client privilege.  As a threshold matter, the Court must confirm that the forty-three documents at issue are privileged. *See Great-W. Life & Annuity Ins. Co. v. Am. Econ. Ins. Co.*, No. 2:11-CV-02082-APG, 2013 WL 5332410, at *7 (D. Nev. Sept. 23, 2013); *see also Multiquip, Inc. v. Water Mgmt. Sys. LLC*, 2009 WL 4261214, at *3 (D. Idaho Nov. 23, 2009) ("[W]hen deciding whether inadvertently-produced documents waives any privilege, a two-step analysis must be done.  First, it must be determined if the material in question is actually privileged[.]").  Ohio law governs the applicability of the attorney-client privilege because this case is before this Court pursuant to its diversity jurisdiction. *See Inhalation Plastics, Inc. v. Medex Cardio-Pulmonary, Inc.*, No. 2:07-CV-116, 2012 WL 3731483, at *1 (S.D. Ohio Aug. 28, 2012) (citing Fed. R. Evid. 501).

Under Ohio law, the attorney-client privilege "protects against any dissemination of information obtained in the confidential relationship." *MA Equip. Leasing I, L.L.C. v. Tilton*, 2012-Ohio-4668, ¶ 19, 980 N.E.2d 1072, 1079 (internal quotations omitted).  After reviewing the documents *in camera*, the undersigned finds the documents are privileged. *See Rodriguez-Monguio v. Ohio State Univ.*, No. CIV A 2:08-CV-00139, 2009 WL 1575277, at *3 (S.D. Ohio June 3, 2009).  It is also worth noting that several of the documents might also be protected by the work-product doctrine, although the parties did not raise it. *See Guy v. United Healthcare Corp.*, 154 F.R.D. 172, 180–81 (S.D. Ohio 1993) (discussing the requirements, contours, and limitations of the work product doctrine).

### A.  Waiver and Federal Rule of Evidence 502

Next, the Court considers waiver, which may be triggered by "behavior by the client or [] [its] attorney [] that is inconsistent with the continued maintenance of that privilege." *Trustees of*

*Elec. Workers Local No. 26 Pension Trust Fund v. Trust Fund Advisors, Inc.*, 266 F.R.D. 1, 11 (D.D.C. 2010). Federal law governs this question. *See Burnett v. Ford Motor Co.*, No. 3:13-CV-14207, 2015 WL 1650439, at *6 (S.D. W.Va. Apr. 14, 2015) ("While the applicability of the privilege is governed by state law, waiver of the privilege is a matter of federal law."); Fed. R. Evid. 502(f). More specifically, Rule 502 of the Federal Rule of Evidence guides the analysis. *See Blankenship v. Superior Controls, Inc.*, No. 13-12386, 2014 WL 12659921, at *2 (E.D. Mich. Nov. 25, 2014).

Rule 502's enactment on September 19, 2008, had dual purposes: (1) to resolve longstanding disputes in the courts about the effect of certain disclosures of communications or information protected by the attorney-client privilege, and (2) to respond to the widespread complaint that litigation costs necessary to protect against waiver had become prohibitive due to the concern that any disclosure (however innocent or minimal) would operate as a subject-matter waiver of all protected communications or information. *See* Fed. R. Evid. 502 advisory committee's explanatory note; *see also Amobi v. D.C. Dep't of Corr.*, 262 F.R.D. 45, 52 (D.D.C. 2009) (noting that Rule 502 "brings uniformity across the circuits to their once differing treatment of the effect of certain inadvertent disclosures of privileged materials").

Prior to the Rule's enactment, courts across the country were divided on when waiver was appropriate.

> Specifically, three distinct positions ha[d] been taken by the courts: the "strict accountability" approach followed by the Federal Circuit and the First Circuit (which almost always finds waiver, even if production was inadvertent, because "once confidentiality is lost, it can never be restored"); the lenient/"to err is human" approach, followed by the Eighth Circuit and a handful of district courts (which views waiver as requiring intentional and knowing relinquishment of the privilege, and finds waiver in circumstances of inadvertent disclosure only if caused by gross negligence); and the third approach, adopting a "balancing" test that requires the court to make a case-by-case determination of whether the conduct is excusable so that it does not entail a necessary waiver.

*Hopson v. Mayor & City Council of Baltimore*, 232 F.R.D. 228, 235–36 (D. Md. 2005). Further, as the advisory committee recognized, increasing litigation costs became particularly acute in the wake of electronic discovery. *See* Fed. R. Evid. 502 advisory committee's explanatory note ("[E]lectronic discovery may encompass 'millions of documents' and to insist upon "record-by-record pre-production privilege review, on pain of subject matter waiver, would impose upon parties costs of production that bear no proportionality to what is at stake in the litigation[.]") (citing *Hopson*, 232 F.R.D. at 244).

Against this backdrop, Rule 502 was designed "to provide a predictable, uniform set of standards under which parties can determine the consequences of a disclosure of a communication or information covered by the attorney-client privilege or work product protection." Fed. R. Evid. 502 advisory committee's explanatory note. The rule states, in relevant part, as follows:

> **(a) Disclosure Made in a Federal Proceeding or to a Federal Office or Agency; Scope of a Waiver.** When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if:
>
>> **(1)** the waiver is intentional;
>> **(2)** the disclosed and undisclosed communications or information concern the same subject matter; and
>> **(3)** they ought in fairness to be considered together.
>
> **(b) Inadvertent Disclosure.** When made in a federal proceeding or to a federal office or agency, the disclosure does not operate as a waiver in a federal or state proceeding if:
>
>> **(1)** the disclosure is inadvertent;
>> **(2)** the holder of the privilege or protection took reasonable steps to prevent disclosure; and
>> **(3)** the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

**(e) Controlling Effect of a Party Agreement.** An agreement on the effect of disclosure in a federal proceeding is binding only on the parties to the agreement, unless it is incorporated into a court order.

Fed. R. Evid. 502(a),(b),(e). Thus, a party may waive the attorney-client privilege intentionally under Rule 502(a), or "by conduct which implies a waiver of the privilege or a consent to disclosure," under 502(b). *Marshall v. Belmont Cty. Bd. of Comm'rs*, No. 2:13-CV-966, 2014 WL 202055, at *3 (S.D. Ohio Jan. 17, 2014) (citing *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999)); *see also First Tech. Capital, Inc. v. JPMorgan Chase Bank, N.A.*, No. 5:12-CV-289-KSF-REW, 2013 WL 7800409, at *2 (E.D. Ky. Dec. 10, 2013).

Although Plaintiff argued briefly that Defendant's production was intentional in its post-hearing brief, (*see* Doc. 48 at 10), there is no evidence that the two productions at issue in this case were intentional or purposeful, meaning Rule 502(b) applies here. Under Rule 502(b), an unintentional disclosure constitutes a waiver unless all three sub-elements are met. *See N. Am. Rescue Prod., Inc. v. Bound Tree Med., LLC*, No. 2:08-CV-101, 2010 WL 1873291, at *8 (S.D. Ohio May 10, 2010) (citing Fed. R. Evid. 502(b)). This standard opted for what was previously known as the middle-ground approach and codified that inadvertent disclosure "does not constitute a waiver if the holder took reasonable steps to prevent disclosure and also promptly took reasonable steps to rectify the error." Fed. R. Evid. 502(b) advisory committee's note.

Along with subsection 502(b), it is also necessary to understand the language of Rule 502(e) when analyzing this dispute. *Great-W. Life & Annuity Ins. Co.*, 2013 WL 5332410, at *10 (noting that Rule 502(e) "provide[s] [an] important tool[] in the effort to effectuate the intent of Rule 502 as a whole"). The advisory committee's note for Fed. R. Evid. 502(e) explains that this section "codifies the well-established proposition" that parties may agree "to limit the effect of waiver by disclosure between or among them." *See also Rajala v. McGuire Woods, LLP*, No. CIV.A. 08-2638-CM, 2010 WL 2949582, at *4 (D. Kan. July 22, 2010). These agreements

limiting waiver, known as "clawback" provisions, "essentially 'undo' a document production and allow the return of documents that a party belatedly determines are protected by the attorney-client privilege or work product immunity." *Id.* (internal quotations omitted). These types of agreements, according to the Fed. R. Evid. 502(d) advisory committee's note, are "becoming increasingly important in limiting the costs of privilege review and retention, especially in cases involving electronic discovery." *Id.*

### B. Inadvertence

#### 1. *Inadvertence Defined*

This is a rare case where inadvertence is challenged because inadvertence is a given in most cases. *See, e.g.*, *Laethem Equip. Co. v. Deere & Co.*, No. 2:05-CV-10113, 2008 WL 4997932, at *8 (E.D. Mich. Nov. 21, 2008), *objections overruled*, 261 F.R.D. 127 (E.D. Mich. 2009) (representative of a matter where "there [was] no suggestion that the disclosure … was anything other than inadvertent"). Plaintiff argues that what Defendant characterizes as "inadvertent" is "in fact nothing short of a negligent, if not reckless, production of allegedly privileged communications." (Doc. 45 at 2). Plaintiff's position presumes, without support, that there are three distinct types of disclosures: (1) intentional, (2) inadvertent, and (3) negligent. (*See id.*).

Rule 502, however, does not distinguish between "negligent disclosure" and "inadvertent disclosure." Instead, the language of Rule 502 allows for only two options: there is either (1) intentional disclosure of privileged material, in which case Rule 502(a) defines the scope of the waiver or (2) an unintentional, inadvertent disclosure, in which Rule 502(b) guides whether waiver occurred. *See First Tech. Capital, Inc.*, 2013 WL 7800409, at *2; *Burd v. Ford Motor Co.*, No. 3:13-CV-20976, 2015 WL 1650447, at *6 (S.D. W. Va. Apr. 14, 2015) ("Rule 502

addresses the consequences that flow from the intentional or inadvertent disclosure of a privileged communication.").

That a negligent disclosure is subsumed within the category of an inadvertent disclosure finds support in the relevant case law. Courts across the country have held that any action that was not intended, not planned, or a mistake, qualifies as "inadvertent"—regardless of how negligent a party's actions were. *See, e.g.*, *In re Tier 1 JEG Telecommc'ns Case in Re Tier 2 JEG Telecommc'ns Cases*, No. 4:07-CV-00043, 2013 WL 12158598 (S.D. Iowa Nov. 25, 2013) ("In ordinary usage something is 'inadvertent' if it is not intended or planned. To show inadvertence the producing party is not required to demonstrate the production occurred despite reasonable precautions to prevent disclosure.") (internal citations omitted); *First Tech. Capital, Inc.*, 2013 WL 7800409, at *2 (holding "that any mistaken, or unintentional, production of privileged material is 'inadvertent'"); *Coburn Grp., LLC v. Whitecap Advisors LLC*, 640 F. Supp. 2d 1032, 1038 (N.D. Ill. 2009) ("In this court's view, the structure of Rule 502 suggests that the analysis" for determining inadvertent disclosure is "whether the party intended a privileged or work-product protected document to be produced or whether the production was a mistake.").

Intuitively, this makes sense based upon the remaining language of Rule 502(b). The reasonableness of counsel's actions are considered expressly in 502(b)(2) and (b)(3), with no evidence that reasonableness should also be part of the (b)(1) analysis. *See, e.g.*, *In re Tier 1 JEG Telecomms. Case in Re Tier 2 JEG Telecomms Cases*, No. 2013 WL 12158598 ("The reasonableness of efforts to prevent disclosure is a separate element from inadvertence implying the latter means only unintended or by mistake."); *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, No. 09 CIV. 9783 RWS, 2013 WL 2322678, at *9 (S.D.N.Y. May 21, 2013) (holding that

the three "requirements [of Rule 502(B)] are separate and should not be conflated in the analysis; in particular, inadvertence under the first prong does not turn on the reasonable steps taken to prevent mistaken disclosure addressed in the second prong."); *Datel Holdings Ltd. v. Microsoft Corp.*, No. C-09-05535 EDL, 2011 WL 866993, at *2 (N.D. Cal. Mar. 11, 2011) (same); Paul W. Grimm, Lisa Yurwit Bergstrom, & Matthew P. Kraeuter, *Federal Rule of Evidence 502: Has it Lived Up to Its Potential?*, 17 RICH. J.L. & TECH 8, at 30 (2011) (noting that "evaluating reasonableness to determine inadvertence creates confusion"). The Court thus concludes that classifying a disclosure is a binary choice: it is either intentional or inadvertent.

### 2. Inadvertence Applied

With this in mind, the Court turns to whether Defendant has met its burden of showing the productions were inadvertent rather than intentional. *See, e.g.*, *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Palladium Equity Partners, LLC*, 722 F. Supp. 2d 845, 850 (E.D. Mich. 2010) ("When a producing party claims inadvertent disclosure, it has the burden of proving that the disclosure was truly inadvertent.") (quoting *Fox v. Massey–Ferguson, Inc.*, 172 F.R.D. 653, 671 (E.D. Mich. 1995)). Defense counsel represented to this Court multiple times, under oath, that the productions at issue were unintentional. (Doc. 46, PAGEID #: 319–20 (Mr. Montgomery swore in an affidavit that "following a privilege review of the documents, Baker Hostetler produced documents to the Plaintiff" and that "no one from Windstream or Baker Hostetler was aware that they contained privileged documents, and . . . [they] certainly did not intend to produce privileged documents to Plaintiff"); *see also* Doc. 47, PAGEID #: 350 (Mr. Douthett testifying that the production inadvertently included privileged materials)).

However, the individuals best equipped to explain the allegedly unintentional productions were not available to the Court for questioning. The second-year associate who allegedly

performed the privilege review prior to the first production and the litigation support staff member who allegedly erred during the second production were not present at the hearing. Thus, the Court did not hear sworn testimony from either of these witnesses. Their absence is particularly troublesome in light of the fact that the undersigned made clear during the April 7, 2017 status conference that a discovery hearing was necessary in order to ascertain all of the relevant facts. (*See* Doc. 47, PAGEID #: 349 (beginning the discovery hearing by stating "[a]s discussed with Counsel, we're going to first address the factual background of this matter and then move to legal argument")). Without an opportunity to hear from these individuals involved directly in the two productions, it is difficult for the Court to determine whether the productions were truly inadvertent.

Nevertheless, the advisory committee notes seem to equate an "intentional" production to a "voluntary disclosure." *See* Fed. R. Evid. 502(a) advisory committee's note. Thus, based on the testimony that the Court did hear, it assumes, *arguendo*, that Defendant has met its burden of showing that the two productions qualify as inadvertent.

## C. Interplay of Rule 502 and Clawback Agreements

Having assumed that Defendant's two productions of privileged documents were inadvertent and thus fall under Rule 502(b), the Court must next examine the impact of the clawback agreement permitted by Rule 502(e). Defendant argues that a clawback agreement under Rule 502(e) "indisputably governs the privilege waiver issue" and supplants the waiver analysis of Rule 502(b). (Doc. 49 at 1). Defendant fails to acknowledge, however, that despite Rule 502's goal of creating uniformity, courts still dispute how to analyze inadvertent disclosures when a cursory clawback agreement exists and alleged carelessness caused an inadvertent production.

The United States Court of Appeals for the Sixth Circuit has not yet addressed how clawback agreements and Rule 502(b) interlace—if at all—in a case like this. Without any such guidance, this Court looks outside the Circuit and reviews three approaches taken by courts across the country: (1) if a clawback is in place, it always trumps Rule 502(b); (2) a clawback agreement trumps Rule 502(b) unless the document production itself was completely reckless; and (3) a clawback agreement trumps Rule 502(b) only if the agreement provides concrete directives regarding each prong of Rule 502(b).

### 1. First Approach

Under the first approach, courts have held that a clawback arrangement (no matter how cursory) requires the return of inadvertently produced documents, regardless of the care taken by the producing party. *See, e.g.*, *Northrop Grumman Sys. Corp. v. United States*, 120 Fed. Cl. 436, 437 (2015) ("Some courts have held that a claw back agreement substitutes for any discovery or evidentiary rules which might otherwise apply.") (listing cases); *Rajala v. McGuire Woods, LLP*, No. CIV.A. 08-2638-CM, 2013 WL 50200, at *5 (D. Kan. Jan. 3, 2013) (holding that there was no need for producing party to show it had taken "reasonable steps" in pre-production privilege review because the parties entered into a clawback agreement that "defeat[ed] operation of Rule 502(b)"); (*United States v. Sensient Colors, Inc.*, No. CIV 07-1275, 2009 WL 2905474, at *2, n.6 (D.N.J. Sept. 9, 2009) (noting that "a clawback arrangement involves the return of documents without waiver irrespective of the care taken by the disclosing party"); *BNP Paribas Mortg. Corp.*, 2013 WL 2322678, at *12 (holding that "because the Protective Order was expressly issued pursuant to Federal Rule of Evidence 502, the parties intended, as that Rule permits, to displace the waiver text of that Rule with the more liberal clawback provisions of the Protective Order") (internal citations omitted); *Tadayon v. Greyhound Lines, Inc.*, No. CIV. 10-1326

ABJ/JMF, 2012 WL 2048257, at *1 (D.D.C. June 6, 2012) (holding that because "the contractual right to clawback documents described in the agreement was not conditioned in any way, let alone upon a showing that the initial production was not the product of negligence . . . the agreement stands as written and defendant may recall the privileged documents, irrespective of whether or not its initial production was negligent.")).  Put another way, Rule 502 has no role to play under this approach.

In these cases, courts have reasoned that a clawback of documents without waiver—irrespective of the care taken by the disclosing party—is a way to curb the excessive costs of pre-production review for privilege and work product.  *See Rajala v. McGuire Woods, LLP*, No. CIV.A. 08-2638-CM, 2010 WL 2949582, at *4 (D. Kan. July 22, 2010).  In other words, this approach gives parties *carte blanche* to clawback documents and the requirements under Rule 502(b)(2) and (3) can be ignored.  Allowing this type of behavior is based "on the theory that the time saved by not doing what the rule contemplates, at least in paragraph (b)(2), is lost if a careful review is still required."  *Northrop Grumman Sys. Corp.*, 120 Fed. Cl. 436, 437.

Defendant argues for this approach, asserting that there would be no purpose in obtaining a joint agreement regarding waiver if the issue of waiver would be determined ultimately by Rule 502(b).  (Doc. 49 at 2–3).  Defendant thus asks this Court to find, consistent with the first approach, that even perfunctory clawback agreements are virtually impenetrable.  *See Great-W. Life & Annuity Ins. Co.*, 2013 WL 5332410, at *14.

### 2. Second Approach

The second approach holds "that where there is a protective order with a clawback provision, inadvertent production of a document does not constitute waiver unless the document production process itself was 'completely reckless.'"  *E.g.*, *BNP Paribas Mortg. Corp.*, 2013 WL

2322678, at *8; *United States v. Wells Fargo Bank, N.A.*, No. 12-CV-7527 JMF, 2015 WL 5051679, at *2 (S.D.N.Y. Aug. 26, 2015); *cf. Fuller v. Interview, Inc.*, No. 07CIV.5728RJSDF, 2009 WL 3241542, at *3 (S.D.N.Y. Sept. 30, 2009) ("[T]he test contained in Rule 502 for determining when a waiver of privilege has occurred is effectively the same as the test that this Court generally employed prior to the Rule's enactment[.]").

Courts in the Second Circuit have largely followed this approach by recognizing that "[i]nadvertent disclosure provisions in stipulated protective orders are generally construed to provide heightened protection to producing parties," but waiver occurs "where the producing party acted in a 'completely reckless' manner with respect to its privilege." *Wells Fargo Bank, N.A.*, 2015 WL 5051679, at *2 (quoting *U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, No. 11–CV–3543, 2014 WL 2116147, at *4–5 (S.D.N.Y. May 14, 2014)). In this line of cases, for production to be classified as "completely reckless," "the producing party must have shown no regard for preserving the confidentiality of the privileged documents." *HSH Nordbank AG New York Branch v. Swerdlow*, 259 F.R.D. 64, 75 (S.D.N.Y. 2009) (internal quotations omitted); *see also Dover v. British Airways, PLC (UK)*, No. 12–CV–5567, 2014 WL 4065084, at *3–4 (E.D.N.Y. Aug. 15, 2014) ("[U]nder the 'completely reckless' standard, inadvertent production will not waive the privilege unless the conduct of the producing party or its counsel evinced such extreme carelessness as to suggest that it was not concerned with the protection of the asserted privilege[.]") (internal quotations omitted)).

For example, six years after the enactment of Rule 502, the Southern District of New York found in *Parnon Energy Inc.* that a production qualified as "completely reckless" when the producing party did "not appear to have conducted any privilege review" of the documents it ultimately produced. 2014 WL 2116147, at *5. The court noted that "[t]his was no mere slip-up

or technical error"—instead the producing party's failure to redact privileged information, "showed a total disregard for the confidentiality of any of the documents." *Id.*

At base, this approach recognizes the value, importance, and inherent power of clawback agreements in protecting parties from an accidental or negligent disclosure in a way that Rule 502(b) does not. *See Wells Fargo Bank, N.A.*, 2015 WL 5051679, at *2–3 (holding that the Government did not waive privilege as to 1,000 documents it sought to clawback because their production was not "completely reckless," and a protective order was in place that provided heightened protection). However, even with this in mind, courts have found that not all clawback agreements can shield a party from the consequences of reckless conduct.

### 3. Third Approach

Consistent with the previous two approaches, the third approach also acknowledges that clawback agreements provide a means to contract around Rule 502(b) in a way that saves parties time and money. However, under the third approach, the requirements of Rule 502(b) can be superseded by a clawback agreement "*only* to the extent 'such an order or agreement [provides] concrete directives regarding each prong of Rule 502(b) *i.e.*, (1) what constitutes inadvertence; (2) what precautionary measures are required; and (3) what the privilege holder's post-production responsibilities are to escape waiver.'" *Burd*, 2015 WL 1650447, at *6 (emphasis added) (citing *Mt. Hawley Ins. Co. v. Felman Prod., Inc.*, 271 F.R.D. 125, 130, 133 (S.D. W. Va. 2010)); *see also Burnett*, 2015 WL 1650439, at *6.

Accordingly, in areas where an agreement lacks specificity, Rule 502(b) is interstitial, filling the silent gaps. *Id.*; *see also, e.g.*, *U.S. Home Corp. v. Settlers Crossing, LLC*, No. CIV.A. DKC 08-1863, 2012 WL 3025111, at *5 (D. Md. July 23, 2012) (noting that some courts have held "if a court order or agreement does not provide adequate detail regarding what constitutes

inadvertence, what precautionary measures are required, and what the producing party's post-production responsibilities are to escape waiver, the court will default to Rule 502(b) to fill in the gaps in controlling law").

In looking specifically at Rule 502(b)(2), these courts have utilized a five-factor analysis to determine the reasonableness of the precautions taken to prevent inadvertent disclosure:

> The stated factors (none of which is dispositive) are the reasonableness of precautions taken, the time taken to rectify the error, the scope of discovery, the extent of disclosure and the overriding issue of fairness. The rule does not explicitly codify that test, because it is really a set of non-determinative guidelines that vary from case to case. The rule is flexible enough to accommodate any of those listed factors. Other considerations bearing on the reasonableness of a producing party's efforts include the number of documents to be reviewed and the time constraints for production. Depending on the circumstances, a party that uses advanced analytical software applications and linguistic tools in screening for privilege and work product may be found to have taken "reasonable steps" to prevent inadvertent disclosure. The implementation of an efficient system of records management before litigation may also be relevant.

Fed. R. Evid. 502(b) advisory committee's note.

In sum, this approach acknowledges the power of a clawback agreement to circumvent Rule 502 but puts the onus on the parties to provide necessary details. And, if the clawback agreement provides insufficient guidance on how to analyze the circumstances of the inadvertent production, Rule 502's three-part test for waiver applies.

### D. Applying the Framework

These approaches balance numerous competing factors—the cost of discovery, predictability to parties, and the goals of Rule 502. One additional consideration, which is important to this Court, is the rationale and purpose of the attorney-client privilege. The attorney-client privilege is designed "to promote 'full and frank communications between attorneys and their clients[,] . . . thereby encourag[ing] observance of the law and aid[ing] in the administration of justice.'" *Guy*, 154 F.R.D. at 177 (quoting *Commodity Futures Trading*

*Comm'n. v. Weintraub*, 471 U.S. 343, 348 (1985)). As a result, it is the client, not the attorney, who is the holder of that privilege. *See, e.g.*, *Fausek v. White*, 965 F.2d 126, 132 (6th Cir. 1992). However, "as the legal expert, it is the attorney who is necessarily the guardian of the privilege." EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE, Vol. I, at 7 (6th ed. 2017). That is, an attorney's decisions or actions that result in a waiver of the privilege will be valid, even if not authorized by the client. *Id.*; *see also Hilton-Rorar v. State & Fed. Commc'ns Inc.*, No. 5:09-CV-01004, 2010 WL 1486916, at *5 (N.D. Ohio Apr. 13, 2010) (an "attorney may (and quite frequently does) [] waive the privilege on behalf of the client").

For that reason, it is an attorney's responsibility to protect the sanctity of that privilege on behalf of the client, and this Court is mindful of that responsibility when approaching the issue of waiver.

### 1. The Court Rejects The First Approach

With this in mind, the Court rejects the first approach. To hold that a clawback agreement always protects against waiver—regardless of its terms and irrespective of counsel's actions—is inconsistent with the underpinnings of Rule 502 and the attorney-client privilege. *See* Grimm, *Federal Rule of Evidence 502: Has it Lived Up to Its Potential?, supra*, at 18 (noting that is a court's responsibility to interpret waiver "in a manner that is consistent with [Rule 502's] purpose"). It also would be an abdication of the Court's role to interpret the parties' agreement in this case.

To be clear, the Court acknowledges that clawback agreements are powerful. They are one tool (among many), which Rule 502 affords to attorneys to protect the sanctity of the attorney-client privilege. If drafted thoughtfully and then followed, clawback agreements effectuate the dual purposes of Rule 502—providing a predictable, uniform set of standards

under which parties can determine the consequences of a disclosure, while simultaneously reducing discovery costs. For example, the predictability is achieved when the parties draft an agreement that is explicit in stating that Rule 502(b)'s reasonableness prong is irrelevant. *See Great-W. Life & Annuity Ins. Co*, 2013 WL 5332410, at *13 ("It goes without saying that parties must adequately articulate the desire to supplant analysis under Rule 502(b) in any agreement under Rule 502(d) or (e)."). And discovery costs are reduced when clawback agreements outline discovery mechanisms that may not pass muster under Rule 502, such as eliminating the need for any pre-production review or enabling lawyers and parties to use computer-based analytical methods to search for and identify privileged and protected information. *See* Grimm, *Federal Rule of Evidence 502: Has it Lived Up to Its Potential?, supra*, at 37.

But for clawback agreements to serve these purposes, lawyers must draft them with care. Indeed, the advisory committee's note states parties "*may* provide for return of documents without wavier irrespective of the care taken by the disclosing party." Fed. R. Evid. 502(d) advisory committee's note (emphasis added). Further, the Court notes that these arrangements are enforceable, even if inconsistent with Rule 502. *See* John M. Facciola, *Sailing on Confused Seas: Privilege Waiver and the New Federal Rules of Civil Procedure*, 2 Fed. Cts. L. Rev. 57, 60 (2007) (explaining that by arrangement, parties can allow for a "sneak a peek" in which "the lawyers for the opposing sides review the collected information by general categories in the hopes of eliminating the useless ones. If that review goes deeper . . . the lawyers [can] agree that their doing so is not a waiver of the privilege even if the review does disclose a privileged document to opposing counsel.").

All of this is to say that the Court reads Rule 502 as providing lawyers a variety of mechanisms by which to protect the attorney-client privilege. Considering Rule 502's text and

purpose, the parties' agreement, and counsel's actions, the Court rejects the first approach in this case. To find otherwise would undermine the lawyer's responsibility to protect the sanctity of the attorney-client privilege. *See U.S. ex rel. Fry v. Health All. of Greater Cincinnati*, No. 1:03-CV-167, 2009 WL 2004350, at *2 (S.D. Ohio July 7, 2009) ("[T]he confidentiality of communications covered by the privilege must be zealously guarded by the holder of the privilege lest it be waived. *The courts will grant no greater protection to those who assert the privilege than their own precautions warrant*.") (internal quotations omitted) (citing *In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989) (emphasis in original)).

The Court also rejects the first approach because it runs of the risk of undermining contract principles. After all, a clawback agreement is a contract, and, like any contract, the Court has the responsibility to interpret it. Here, the Court interprets the parties' agreement as having contemplated a meaningful privilege review. The agreement does not mention eliminating pre-production review, engaging in a document dump or a sneak a peek arrangement, or that no waiver will occur regardless of care taken by the producing party. Following the first approach here would effectively re-write the parties' agreement into something it was not, and the Court refuses to do so.

### 2. Under Either The Second or Third Approach, Waiver Has Occurred

Both the second and third approach appeal to this Court, for reasons discussed below, but the Court need not choose because Defendant has waived privilege under either. Because, when taking into account the careless privilege review, coupled with the brief and perfunctory clawback agreement, following either approach leads to the same result: Defendant has waived the privilege.

i.    Defendant Has Waived Privilege Under the Second Approach

Under the second approach, courts have noted (and as this Court has emphasized) that "[i]nadvertent disclosure provisions in stipulated protective orders are generally construed to provide heightened protection to producing parties." *Parnon Energy Inc.*, 2014 WL 2116147, at *4.  This heightened protection is lost, however, if a disclosure was "completely reckless." *Id.* Thus, while recognizing the great power of clawback agreements, this approach also provides an important limitation.   That limitation—that waiver will result from a completely reckless production—applies here.

In analyzing what constitutes complete recklessness, courts have considered the amount of privileged documents inadvertently produced, the amount of documents ultimately reviewed, and the type of review process engaged in by the producing party. *See Swerdlow*, 259 F.R.D. at 75 (upholding privilege where nine of the 250,000 documents produced were privileged documents, or less than one-hundredth of one percent of those reviewed); *In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, No. 12 MD 2335 LAK, 2014 WL 4827945, at *1, n. 5 (S.D.N.Y. Sept. 22, 2014) ("chalk[ing] the production of the scantily redacted copy of this document up as a mistake, doubtless by a young lawyer or paralegal who perhaps was not sufficiently briefed or suffering from fatigue borne of too many hours in front of a computer monitor" when over 71,000 documents required redaction); *Parnon Energy Inc.*, 2014 WL 2116147, at *5 (finding that privilege had been destroyed where producing party did "not appear to have conducted any privilege review" and production was not a result of a "mere slip-up or technical error).

Here, defense counsel advised that they performed two levels of privilege review prior to the first production.  Yet, the documents contain obviously privileged material on their face.  For

example, despite defense counsel's representation that it was unaware an employee of Defendant's was in-house counsel, several of her emails contain her signature line, in which the title of "Counsel" is prominently displayed. Moreover, almost one-third of the contested documents contain the word "legal." Any layperson who understands the basic concepts of privilege would at least have identified these documents as suspect. Further, the utilization of any basic key-word search would have flagged these documents for additional review.

Based upon these facts, the Court is skeptical that two levels of *attorney* review took place. Indeed, the Court is unconvinced that any meaningful review of the documents occurred. Mr. Douthett's testimony at the hearing only exacerbated the Court's skepticism. He carefully selected his words in saying that he'd spoken to the junior attorney "repeatedly about this, and she *believes* she performed the privilege review." (*Id.*, PAGEID #: 350) (emphasis added). It is curious that defense counsel would not, or could not definitely confirm that a privilege review took place, especially in light of the repeated requests by the Court for the parties to present all relevant facts.

It is also worth noting that the first production was not the result of a technical error or third party-vendor mistake. Instead, attorneys reviewed a limited number of documents and made critical and reckless mistakes. This is not a case in which defense counsel was reviewing hundreds of thousands of documents and a few managed to evade review—a situation that is likely and almost unavoidable in massive document reviews. Instead, this is a case in which only 1400 readable pages were produced initially, and of those pages, 146 pages—or more than 10% of the entire production—were missed.

And then, Defendant produced the exact same documents again—while simultaneously asking this Court to protect its privilege. Although defense counsel testified a "spot check" was

performed of the documents in the second production, once again, the facts do not add up.  With twenty-nine documents (totaling 112 pages) needing redactions, even the most rudimentary spot check would have raised suspicions, as none of the documents in the second production contained any redactions at all.

Here, the privileged documents represent more than 10% of the documents produced; only 2200 total pages were produced and Defendant had months to produce the first production; and the review process "mistake" was not the result of a technical error or mistake borne from hours and hours of review for this case.  Accordingly, the Court finds under the second approach, Defendant's production was reckless.  This recklessness leads the Court to hold that privilege has in fact been waived.

Make no mistake, the Court is sympathetic that in this day and age privileged documents will inevitably fall through the cracks and be produced inadvertently.  *See Parnon Energy Inc.*, 2014 WL 2116147, at *4 ("Given the scale of document production in contemporary litigation, errors—even those involving multiple documents—are inevitable.").  Yet, as the "guardian" of the attorney-client privilege, it is a lawyer's responsibility to minimize the cracks through which privileged material might slip.  The Court believes the second approach adequately recognizes an attorney's responsibility to guard that privilege, and holds an attorney accountable when normal cracks become chasms—as was the case here.

ii.     Defendant Has Waived Privilege Under the Third Approach

Application of the third approach leads to the same result.  Under this framework, if a clawback order "does not include any concrete terms explaining what precautions must be taken to meet the reasonableness standard in the second prong of Rule 502(b)" then "the Court will rely on Rule 502(b) to fill in the gaps."  *Burd*, 2015 WL 1650447, at *6.

The Court understands the general critique to this approach—that it stunts the parties' ability to contract around Rule 502(b)'s requirements.  *See* Grimm, *Federal Rule of Evidence 502: Has it Lived Up to Its Potential?, supra*, at 64 (discussing how "some courts have displayed a misguided reluctance to accept that parties may agree to procedures that would not be deemed reasonable under Rule 502(b)(2) or (3)").  To be clear, that is not what the Court is doing here, and that is not how it reads the third approach.  Instead, the Court views the third approach as appreciating the power of clawback agreements but providing an analytical mechanism for the court to revert back to Rule 502(b)'s requirements if an agreement is so perfunctory that its intentions are not clear.  In other words, the third approach gives guidance to courts in reviewing cursory clawback agreements—like the one at issue in this case.

The remaining issue is whether Defendant took reasonable steps to prevent disclosure in the first place.  For the reasons that the production was deemed completely reckless—that defendant had months to review the documents before they were first produced, the self-evident nature of the privileged documents, the careless review process during the first production for a minimal number of documents, and the lack of oversight shown by defense counsel in producing the privileged documents a second time—the Court finds that Defendant did not take reasonable steps in preventing the disclosure of the forty-three documents at issue.  *See Mt. Hawley Ins. Co.*, 271 F.R.D. at 136.

Consequently, Defendant has not satisfied all three subsections of Rule 502(b) and has waived protection for the documents at issue.  *See id.*

### E.  Scope of The Waiver

The advisory committee's note states that "a subject matter waiver (of either privilege or work product) is reserved for those unusual situations in which fairness requires a further

disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." Fed. R. Evid. 502(a) advisory committee's note (citing *In re United Mine Workers of America Employee Benefit Plans Litig.*, 159 F.R.D. 307, 312 (D.D.C. 1994)). Accordingly, "subject matter waiver is limited to situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner." *Id.* It thus follows "that an inadvertent disclosure of protected information can never result in a subject matter waiver." *Id.* (citing Rule 502(b)).

As discussed previously, there is no evidence that Defendant intentionally waived the attorney-client privilege when it produced the forty-three documents at issue on two separate occasions, and defense counsel vehemently argued to the contrary. Although that evidence may or may not be sufficient to meet Defendant's burden in establishing that the disclosure was "inadvertent" (a question the Court ultimately did not need to reach), it is enough to satisfy the Court that Defendant did not put protected information into this litigation in a selective, misleading, and unfair manner. *See Seyler v. T-Sys. N. Am., Inc.*, 771 F. Supp. 2d 284, 288 (S.D.N.Y. 2011). Accordingly, the Court finds there has not been subject-matter waiver and that Defendant has waived its privilege only to the forty-three documents at issue.

## F. Sanctions

Defendant argues that Plaintiff's conduct—that is, not returning or destroying the documents at issue upon defense counsel's claim of privilege, while simultaneously reviewing them—is sanctionable. (Doc. 49 at 9; transcript). Defendant notes that under Fed. R. Civ. P. 26(b)(5)(B), upon a claim of privilege, the receiving party "must promptly return, sequester, or destroy, the specified information and any copies it has[,]" and "must not disclose the

information until the claim is resolved." Defendant asserts that Plaintiff violated the Rule repeatedly by refusing to return the documents, as well as reviewing them. (Doc. 49 at 9).

The Court disagrees. Plaintiff's counsel testified at the hearing as follows:

> [A]t all times, Your Honor, from the time we initially got these documents to the present day, these documents have been sequestered by us. They have been attorney eyes only, and we have not even discussed with our client the issue here of that there may be some privileged documents that were disclosed. So, we have maintained the integrity of this, and I just want to point that out as we go through.

(Doc. 47, PAGEID #: 362). With this in mind, the Court is satisfied that Plaintiff's counsel's actions were in compliance with Fed. R. Civ. P. 26(b)(5)(B).

The Court notes that the clawback agreement between the parties stated that upon notification of inadvertent production, "[t]he receiving party will promptly destroy or return all copies of the inadvertently-produced document." (Doc. 45-1, PAGEID #: 307). However, as discussed at great length above, the clawback agreement was ambiguous and deficient. The Court is therefore satisfied that Plaintiff's counsel complied with Fed. R. Civ. P. 26(b)(5)(B) in the midst of confusion regarding if and how the clawback agreement applied. Consequently, sanctions are not warranted.

## IV. CONCLUSION

For those reasons, this Court agrees with Plaintiff that Defendant's conduct waived the privilege. Consequently, Defendant's request for sanctions and the return of the forty-three documents is **DENIED**.

## PROCEDURE FOR RECONSIDERATION

Any party may, within fourteen (14) days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); Eastern Division Order No. 91–3, pt. I., F., 5. The motion must

specifically designate the Order or part in question and the basis for any objection.  Responses to objections are due fourteen (14) days after objections are filed.  The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This order is in full force and effect, notwithstanding the filing of any objections, unless stayed by the Magistrate Judge or District Judge.  S.D. Ohio L.R. 72.3.

IT IS SO ORDERED.


Date:  August 2, 2017                                   /s/ Kimberly A. Jolson
                                                        KIMBERLY A. JOLSON
                                                        UNITED STATES MAGISTRATE JUDGE